UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 08 CR 49 |
| Plaintiff, | ) | |
| | ) | Judge Norgle |
| vs. | ) | |
| | ) | |
| MARK KOZIK AND HEIDI KUNZ | ) | |
| | ) | |
| Defendants. | ) | |

**GOVERNMENT'S RESPONSE TO KUNZ'S
MOTION TO QUASH ARREST AND SUPPRESS STATEMENTS**

Now comes the UNITED STATES by PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, and respectfully responds to Defendant Heidi Kunz's Motion To Quash Arrest and Suppress Statements, as follows:

I.   Introduction

On May 9, 2007, defendant Mark Kozik ("Kozik"), wearing a blonde wig, latex gloves and brandishing a gun, walked into State Bank and Trust in Lakemoor, Illinois, and handed a teller a pink printed note demanding money. Kozik walked out of the bank with $11,185.00, and escaped in a waiting car driven by his wife, defendant Heidi Kunz ("Kunz").

On July 2, 2007, Kozik walked into TCF Bank in Spring Grove, Illinois, wearing a latex glove and brandishing a gun, and handed the teller a note demanding money. The teller gave Kozik $584, along with a concealed red dye pack. Kozik escaped in a car driven by Kunz, again acting as the getaway driver. In the car, the red dye pack exploded, leaving red stains on the money, the latex glove, the gun and the car carpet.

On August 7, 2007, Kozik, wearing a red wig and a torn latex glove stained with red dye, walked into National City Bank in Fox Lake, Illinois. Kozik brandished a gun that also had red dye

stains. Kozik handed the teller a pink printed note demanding money. After the teller turned over $2,502, Kozik ran out and jumped into in a waiting car driven by Kunz. Kozik left behind the pink printed note and, on the note, his fingerprint. On September 24, 2007, Fox Lake police learned that the fingerprint had identified Kozik as the bank robber. His wife, Kunz, fit the description of the getaway driver.

On January 17, 2008, the grand jury returned an indictment charging Kunz with three bank robberies, in violation of Title 18, United States Code, Section 21113(a), and three counts of using a firearm in relation to a crime of violence, in violation of Title 18, United States Code, Section 924(c)(1)(A)(ii). On September 26, 2007, Kozik and Kunz were arrested, and Kunz confessed to the robbery of National City Bank. She also consented to a search that evening, during which law enforcement seized the gun used in connection with the bank robberies. On September 27, 2007, Kunz confessed to the other two bank robberies, and provided a videotaped confession to all three bank robberies.[1] On July 14, 2008, Kunz filed a motion to suppress her statements of September 26, and the evidence seized on that date. Her affidavit in support of the motion to suppress contends that (1) she was not given proper *Miranda* warnings on September 26, 2007, because each right was not separately explained to her, and (2) she did not consent to the search on September 26 until after the search was conducted. Her claims are neither factually accurate nor legally relevant and, therefore, her motion to suppress should be denied.

---

[1] Kunz further confessed to the robberies of "Cash'n'Go" stores, for which charges are now pending in State court.

II.    The Facts

    A.    September 26: Kunz Received Verbal and Written *Miranda* Warnings and Voluntarily Waived Her Miranda Rights Verbally and In Writing and. Further, Provided Verbal and Written Consent to Search Prior to the Search.

After receiving the information that the fingerprint on the demand note left at National City Bank identified Kozik, Fox Lake police officer Michael Ostertag and Detective Joseph Martin conducted surveillance on the home shared by Kozik and Kunz on September 24 and 25, 2007, but nobody appeared to be home. On September 26, 2007, at approximately 7:00 p.m., the two Fox Lake officers again conducted surveillance -- this time, they saw a car in the driveway of the home that matched the description of the getaway car in the bank robberies. Detective Martin and Officer Ostertag then returned to the Fox Lake Police station and met with their Sergeant to formulate a plan, and then met up with other officers assigned to assist them. At approximately 8:41 p.m., officers arrived at the home shared by Kozik and Kunz. *See* Exhibit A, attached hereto. Detective Martin and Officer Ostertag approached the front door, while other officers watched the back of the house and the street perimeter. When Detective Martin and Officer Ostertag knocked, Kozik answered the door, identified himself, was taken into custody and read his *Miranda* rights.

Kunz appeared at the door almost immediately. When she identified herself, Detective Martin provided verbal *Miranda* warnings to Kunz. Kunz admits that the officers warned her that she "had a right to remain silent" and that "anything [she said] could be used against [her] in court." Motion, p. 3, Kunz Affidavit, ¶7. Detective Martin and Officer Ostertag then presented Kunz with a written *Miranda* advisory and waiver, which she signed. *See* Exhibit B, attached hereto. The time noted on the written Miranda waiver is 8:45 p.m., and the location is the house. *Id*. The written Miranda advisory specifically lays out each right, including the right to have an attorney. *Id*.

3

After Kunz signed the written *Miranda* waiver, the officers explained to Kunz why they were there. The officers asked Kunz for her consent to search the house. Kunz provided verbal consent, and added, "I don't have anything to hide." The officers asked Kunz to sign a written Consent To Search form, which she signed at 9:00 p.m.. *See* Exhibit C, attached hereto. One of the assisting officers transported Kozik to the Fox Lake Police Station at 9:12 p.m.. While Kunz remained in her living room, smoking cigarettes, two officers searched the house, and found a firearm magazine. Two other officers, accompanied by Kunz, then searched the garage. Before the officers opened a cabinet in the garage, Kunz began to cry and acknowledged that there was a weapon in the cabinet. There, the officers found the gun, stained from the red dye pack.[2] At 9:52 p.m., Kozik was transported to the Fox Lake Police station. *See* Exhibit A, attached hereto.

At approximately 10:15 p.m. at the station, the officers began interviewing Kunz. At 10:30 p.m., Kunz drew the diagram of where she parked as the getaway driver in the National City Bank robbery, with the time noted on the diagram. *See* Exhibit D. After further questioning, the officers asked Kunz to write a statement, but Kunz asked if she could type the statement due to her poor handwriting. Kunz typed the statement at 11:25 p.m. *See* Exhibit E. After less than two hours of non-continuous interrogation, Kunz was put in a cell for the night.

In summary, on September 26, Kunz received both a verbal and a written *Miranda* advisory, and waived her Miranda rights orally and in writing. She also gave both an verbal and written consent to search, while at the house prior to the search.

---

[2] While at the house, one of the officers also looked through the windows of the car, and saw the carpet stained with red dye from the red dye pack, and a hole cut out of the carpet (where the red dye pack stain had caused Kozik and Kunz to cut out the carpet).

> B.   Kunz's Continued Waiver of Her *Miranda* Rights and Repeated Consents to Search On September 27 Show That She was Freely and Voluntarily Cooperating.

In her Motion to Suppress, Kunz does not challenge the verbal and written *Miranda* warnings she received on September 27, nor does she challenge her verbal and written consents to search on that day. Kunz's voluntary waivers and consents on September 27 are relevant to show that she was freely and voluntarily cooperating during her entire interaction with the police. On September 27, officers from other jurisdictions arrived at the Fox Lake Police Department to question Kunz about robberies in their own jurisdictions. At 12:15 p.m., Detective Martin, now joined by Detective Sittig of the Lake County Sheriff's office (who was investigating the robbery of State Bank in Lakemoor), reminded Kunz of her *Miranda* rights and asked if she had any questions about them. Kunz specifically acknowledged that she understood them and had no questions. Kunz does not contest her valid *Miranda* waiver at this time, nor does she move to suppress her statements made after this renewed waiver.

Kunz then spoke to the officers. The officers requested Kunz's consent to search the house again. Kunz gave verbal consent. After being driven back to the house to secure her dog, she signed a another Consent to Search at 2:00 p.m., while at the house. *See* Exhibit F. The officers at that time seized, among other items, clothing worn during various robberies, pink printed notes and a pink ink cartridge. Kunz does not contest this verbal and written consent to search.

The officers and Kunz returned to the Fox Lake Police Station, where, at 4:45 p.m., Kunz signed another written *Miranda* advisory and waiver, in which she also consented to provide a videotaped statement. *See* Exhibit G. At the beginning of the videotaped statement, Kunz is again

reminded of her *Miranda* rights.[3] In the videotaped statement, which lasted one hour, Kunz speaks freely, without any undue duress or influence. She specifically and freely acknowledges that her treatment has been good, and that she was provided with food and drink. In the videotaped statement, Kunz provides details of each of the three bank robberies, as well as the three local robberies. On the video, Kunz gives another verbal consent to search her house, and signs another written Consent to Search, so that the officers could locate specific items she mentioned in her videotaped statement, including the red stained glove, the box of latex gloves, and certain clothing. *See* Exhibit I. Kunz then went with the officers to the house and showed them where to find these items. Kunz does not contest her verbal and written *Miranda* waivers, or her consent to search at this time.

Tellingly, on October 2, 2007, Kunz signed another written *Miranda* waiver. *See* Exhibit J. She also signed a written Consent to Buccal Swab, for purposes of providing her DNA sample for purposes of analyzing the female DNA found on a cap dropped by Kozik at the TCF Bank robbery. *See* Exhibit K. Kunz told the officer at that time that the female DNA profile found on the cap could be from the wig worn by her husband during the bank robbery, because it was made of human hair. Thus, even five days later, after she had ample opportunity to think about it, Kunz willingly signed yet another *Miranda* waiver and a Consent to Buccal Swab, and spoke freely to the officer.

---

[3]The videotaped statement, submitted as Exhibit H, has been delivered to the Court on July 9, 2008, in connection with the Government's Motion For Separate Trials, granted on July 11, 2008.

III.    <u>Kunz's Motion To Suppress</u>

In her motion to suppress, Kunz challenges only the *Miranda* warnings and the consent to search given on September 26, apparently seeking to suppress only the statements given and the evidence seized on that day. Kunz does not claim that she did not receive *Miranda* warnings on September 26, 2007, only that the initial verbal warnings were incomplete. Kunz also does not contest that she received and signed a complete written *Miranda* waiver, only that each right was not separately explained to her. However, Kunz makes no claim that she did not, or was unable to, read and understand her rights at the time that they were given to her. Indeed, her continued waivers the next day, and five days later, show that she freely waived her rights repeatedly.

IV.    <u>The Law</u>

    A.    <u>The Initial Detention of Kunz Was Legal</u>.

The status of Kunz's initial detention to determine whether she was in custody for purposes of *Miranda* is irrelevant here, because the government contends that Kunz was given sufficient *Miranda* warnings. Kunz's actual confession came only later that night, after seizure of the gun and Kunz's arrest and transport to the station. Kunz does not challenge the status of her detention after the search.

Kunz challenges only the status of her intial detention, which is relevant to her consent to search to the extent that she claims that her consent was not voluntary because she had been seized illegally. *See United States v. Johnson*, 427 F.3d 1053 (7th Cir. 2005), in which officers, acting on an anonymous, uncorroborated tip, approached defendant in his home, where defendant did not give consent when asked to search his house. One officer then pulled his gun on defendant to restrict defendant's movements, after which defendant acquiesced in a search, without having been given

7

*Miranda* warnings. The court held that the officers lacked "reasonable suspicion" to seize the defendant and, without an intervening act of attenuation, defendant's consent to search his home was not voluntary. In our case, the officers had reasonable suspicion to seize Kunz, the intervening *Miranda* warnings and written consent attenuated her consent, and her consent was provided voluntarily.

The officers had probable cause to seize Kunz from the start. Descriptions of the male robber fit Kozik. Descriptions of his female accomplice, the getaway driver, fit Kunz.[4] Her husband's fingerprint was left on the robber's demand note. The car in the driveway fit the description of the getaway car. Based upon the descriptions, the fingerprint, the car and the relationship between the two, the officers certainly had probable cause to believe that Kunz was the getaway driver. *See e.g., United States v. Chapman*, 954 F.2d 1352, 1357 (7th Cir. 1992) (where the officers knew that a bank robbery had just occurred and the description of the getaway car matched that of the defendant, and the defendant failed to obey the officers' initial command to pull over, the officers had probable cause to arrest the defendant).

Even with probable cause to arrest Kunz, the officers did not initially arrest her. Initially, the officers detained Kunz temporarily for investigative purposes, which requires only reasonable suspicion that Kunz had committed a crime. *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968). Clearly, the officers had reasonable suspicion at the very least to believe that Kunz was the getaway driver, and until the gun was recovered, detained her only in a manner consistent with an investigative purpose.

---

[4] Kunz argues that the description did not fit because the age of the getaway driver was estimated at around 40, whereas Kunz is 30. An inexact age is not unusual, particularly in a case where witnesses observed Kunz in a car, from a distance. Moreover, as the photograph submitted by Kunz shows, and as this Court can observe for itself, it is not unreasonable to mistake Kunz for older than her actual age.

Immediately upon learning her identity, the officers gave Kunz *Miranda* warnings and obtained her verbal and written consent to search. At the time that she provided her verbal and written consent to search, Kunz's encounter with the officers had lasted approximately 15 minutes, and, in contrast to her husband, she had not been removed from the house nor had she been handcuffed during that time. *See United States v. Burns*, 37 F.3d 276, 279 (7th Cir. 1994), discussing permissible pre-arrest seizures under the Fourth Amendment, and concluding that defendant's temporary detention in her hotel room while police executed a search warrant was a short, limited permissible intrusion. *See also Michigan v. Summers*, 452 U.S. 692, 702 (1981), holding that a temporary detention "in the owner's residence involves neither the inconvenience nor the indignity associated with a compelled visit to the police station." *Compare United States v. Cellitti*, 387 F.3d 618 (7th Cir. 2004) (detainee who had been handcuffed, driven to police station, locked in a cell and chained to a bench for several hours had been arrested rather than being under investigatory detention, thus requiring probable cause rather than reasonable suspicion). Any detention of Kunz subsequent to her consent to search is irrelevant in assessing whether her consent to search was voluntary, including a temporary detention of Kunz during the search, *Michigan v. Summers*, 452 U.S. 692 (1981); and including Kunz's factually inaccurate claim that she did not provide written consent until after she was arrested and brought back to the police station, because her verbal consent to search was sufficient. *United States v. Strache*, 202 F.3d 980, 985 (7th Cir. 2000)(verbal consent to search is sufficient); *United States v. Willis*, 61 F.3d 526, 530-32 (7th Cir. 1995) (allowing verbal consent to search).

      Finally, regardless of the status of Kunz's initial detention, her consent was attenuated from her detention such that it is not a product of her detention. *See United States v. Ochoa*, 2007 WL

1224024 (7th Cir. April 18, 2007), in which the court held that the fact that the defendant was under arrest at the time he gave consent to search his home did not render his consent involuntary, where the defendant was not subjected to threats, physical abuse, lengthy detention or prolonged questioning, the defendant agreed to the search immediately upon his arrest and he was advised that he had the right to require a search warrant; *United States v. Strache*, 202 F.3d 980, 985-86 (7th Cir. 2000), holding that defendant's consent to search was voluntary, even though defendant was handcuffed and had not been advised of his rights, where the police did not badger him for consent, he was not physically abused or pressured, and he had been in police custody for only twenty minutes when he consented to the search. Here, Kunz was not handcuffed, she was in her own home and she had received *Miranda* warnings when she consented to the search. There were no repeated requests, threats, physical abuse, lengthy detention or prolonged questioning preceding the consent. Kunz consented within approximately 15 minutes after encountering the officers. She consented verbally and in writing, and the written consent to search form advised her that she had the right to refuse consent. *See* Exhibit B, attached. In reviewing the factors that bear upon the voluntariness of her consent, the same factors that bear upon the validity of her waiver of *Miranda* rights, the evidence shows that Kunz voluntarily waived her *Miranda* rights and consented to the search.

      B.    <u>Kunz's *Miranda* Waivers and Consents to Search Were Voluntary</u>.

Kunz correctly points out in her motion that "[v]oluntariness is a question of fact to be determined from all the circumstances, and while a subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing voluntary consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49

(1973). Kunz also correctly identifies that the following factors be considered in assessing the voluntariness of both her waiver of *Miranda* rights and her consent to search: (1) whether she was advised of her constitutional rights; (2) her age, education, intelligence and mental state; (3) the length of her detention prior to consent; (4) whether she consented immediately or police made repeated requests for consent; (5) whether physical coercion was used, including deprivation of food, drink and sleep; (6) whether defendant was in custody.

Kunz was advised of her constitutional rights, both verbally and in writing. The oral *Miranda* warning alone was sufficient. *See United States v. Murdock*, 491 F.3d 694 (7th Cir. 2007). Even so, the written advisory sets forth each right separately, including the right to an attorney. After being advised of these rights both orally and in writing, there is no evidence that Kunz did not understand these rights. Indeed, Kunz affirmed that she understood these rights when, the next day, she was asked if she understood the rights given to her the prior day and if she had any questions, and she answered that she understood them and had no questions.

Kunz's age, education, intelligence and mental state show that she understood and voluntarily waived her Miranda rights and consented to the search. Kunz is thirty years old. Courts expressing concern over the age of a defendant in assessing a waiver or consent usually are faced with a juvenile, a factor inapplicable here. *A.M. v. Butler*, 360 F.3d 787 (7th Cir. 2004 (juvenile's wavier of rights while in custody were involuntary); *Hardaway v. Young*, 302 F.3d 757 (7th Cir. 2002) (waiver by 14-year-old was voluntary). Courts expressing concern over a defendant's intelligence or mental state in assessing a waiver or consent usually are faced with a defendant whose I.Q. indicates a serious mental deficiency, which is not at issue here. See Young v. Walls,

311 F.3d 846, 849 (7th Cir. 2002) (defendant who had a low IQ, and could not even answer basic questions, still could voluntarily confess to a crime).

Kunz claims only that she was exhausted and "not in shape to argue with the officers," when she typed her statement at 11:25 on September 26, several hours after she had waived her constitutional rights and several hours after she had consented to the search of her home. This says nothing about her mental state at the time of her waiver and consent. Kunz also claims that the officers told her that she would not be charged if she cooperated.[5] Aside from the credibility of whether defendant actually believed that she was going to go free after confessing to numerous robberies, promises related to cooperation do not render a confession involuntary, particularly in light of *Miranda* warnings that anything a defendant says can be used against him or her. *United States v. Rutledge*, 900 F.2d 1127 (7th Cir. 1990). Kunz also claims that the officers told her that her husband's fingerprint had been found on the bank note, a fact that is true and also does not make her confession involuntary. "No court has held a confession involuntary just because the questioner accurately informed a suspect that he had been implicated by someone else. . . The truth may make a confession more likely, but it does this by enabling the suspect to make an informed choice, not by overbearing the will." *Barrera v. Young*, 794 F.2d 1264, 1270 (7th Cir. 1986)(citations omitted). Here, a reasonably intelligent thirty-year old adult made a reasonable decision that cooperation would help her more than if she the officers had obtained search warrants and built the case without her cooperation.

---

[5]This claim also belies Kunz's claim that she was too exhausted to "argue with the officers" about typing her confession. If Kunz believed that she would be released upon cooperating, then she had no intention of arguing with the officers, exhausted or not.

The length of the Kunz's detention at the time of her waivers and consent do not support a lack of voluntariness. Kunz waived her *Miranda* rights immediately, after the initial advisory, in the comfort of her own home. She gave oral and written consent to search within approximately fifteen minutes of the officers' approach, upon the first request, still in the comfort of her own home. At the time, she had not endured any interrogation. Moreover, back at the station, there was no lengthy time during which the officers broke down her initial will to remain silent. Kunz cooperated from the beginning and throughout. The subsequent questioning back at the station on the night of September 26 commenced ninety minutes after she first waived her rights, and lasted less than one and a half hours: the interview began at approximately 10:15, and Kunz typed her statement at 11:25 p.m.. *See United States ex. rel. Henne v. Fike*, 563 F.2d 809, 814 (7th Cir. 1977)(nine hours between warnings and waiver not too long). During that time, Kunz never reasserted her *Miranda* rights. Kunz never contends that she was physically abused or deprived of food, drink or sleep and, indeed, the interrogation began after the dinner hour and was done in time for her to be sent to lock up for a night's sleep. Courts expressing concern over the nature and duration of an interrogation in assessing the voluntariness of a waiver or consent usually are faced with a defendant who was in custody for many hours before agreeing to waive *Miranda* rights, under conditions that are not alleged here. *See United States v. Huerta*, 239 F.3d 865 (7th Cir. 2001)(defendant, who had been in custody for eleven hours, and claimed to be tired, hungry and medicated, nevertheless voluntarily waived her *Miranda* rights and gave a voluntary confession).

Kunz simply does not present any evidence that demonstrates that her *Miranda* waiver or her consent to search were involuntary. Her only claims are that the written forms, presented after she already had verbally waived her rights and consented to a search, were not read to her. She

makes no claim that she could not , or did not, read them prior to signing. She makes no claim that she did not voluntarily waive her *Miranda* rights verbally or give her consent to search verbally. Kunz's motion to suppress simply has no merit. *See Conner v. McBride*, 375 F.3d 643 (7th Cir. 2004) (defendant's confession was deemed voluntary where defendant was an adult, signed waivers of his Miranda rights, was subjected to a three-hour interrogation with no physical abuse, was provided food and drink, and facts in confession were corroborated).

V.   Conclusion

The evidence shows that Kunz voluntarily waived her Miranda rights and consented to a search of her home on September 26, 2007. Thus, Kunz's confession of that date and the evidence seized on that date, are admissible.

WHEREFORE, the government respectfully requests that this Court deny Kunz's motion to suppress.

>Respectfully submitted,
>
>PATRICK J. FITZGERALD
>United States Attorney
>
>By:   *S/ Sheri H. Mecklenburg*
>      Sheri H. Mecklenburg
>      Assistant United States Attorney
>      219 South Dearborn Street
>      Chicago, Illinois 60604
>      (312) 469-6030

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that the **GOVERNMENT'S RESPONSE TO KUNZ'S MOTION TO QUASH ARREST AND SUPPRESS STATEMENTS** was served on July 29, 2008, in accordance with Fed. R. Crim. P. 49 and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

　　　　　　　　　　　　　　　　　　　　*s/ Sheri H. Mecklenburg*
　　　　　　　　　　　　　　　　　　　Sheri H. Mecklenburg
　　　　　　　　　　　　　　　　　　　Assistant United States Attorney
　　　　　　　　　　　　　　　　　　　219 S. Dearborn Street
　　　　　　　　　　　　　　　　　　　Chicago, Illinois  60604
　　　　　　　　　　　　　　　　　　　(312) 469-6030